UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 4:20-CR-384-SDJ |
| | § | |
| JOHNELL LAVELL BARBER, II (1) | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendant Johnell Lavell Barber II has been indicted for Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). The felony underlying the charge against Barber is his previous conviction for second degree murder. By any measure, Barber is a dangerous felon whose possession of firearms presents a significant risk to the community. But Barber believes the charge against him must be dismissed because, in his view, the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, —— U.S. ——, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), renders Section 922(g)(1) unconstitutional on its face. Based on this argument, Barber has moved to dismiss the single-count indictment against him.[1]

While it is true that *Bruen* clarified the standard for evaluating whether firearm regulations run afoul of the Second Amendment, there is no doubt that Section 922(g)(1)'s application to dangerous felons, like Mr. Barber, does not offend the Amendment's guarantee of the individual right to keep and bear arms. The motion will be denied.

---

[1] Barber's motion was filed untimely, just days before his scheduled trial. The motion was carried through trial. The jury found Barber guilty of the charged offense.

# I. BACKGROUND

On December 7, 2020, police officers responded to calls in Denison, Texas, to investigate a shooting in which a man and his ten-year-old daughter had been wounded—the child in the head—while driving down W. Crawford Street. At the scene, the officers located and interviewed the likely intended targets of the shooting, four individuals, three of whom were juveniles, who had driven down W. Crawford Street in another car. The four individuals told officers they had been driving to 1217 W. Crawford Street to fight another group of juveniles but kept driving past the house when they saw people standing in the yard with firearms. They heard gunshots as they drove by, and their car was struck, resulting in a flat tire. One of the young men pointed out 1217 W. Crawford Street to the officers and informed them that the shooter had retreated into the residence.

At that point, Detective John Watt approached the home and made contact with Barber's wife Shiffon Wilson Barber (hereinafter "Wilson"), who identified herself as the owner of the home, in which Barber also resides. Detective Watt advised Wilson that Denison Police had information that a shooter had gone into her house and asked her for consent to search the property for firearms. Wilson refused. The officer then instructed Wilson to remove her son from the residence as he and other officers would be conducting a protective sweep.

After beginning the sweep, officers located Barber, who emerged from a bedroom. Once outside, Barber gave the police a false name prior to correctly identifying himself. Officers then determined that Barber had an outstanding

warrant, and he was placed under arrest for the warrant and for failure to identify himself.

Following Barber's arrest, officers ultimately obtained consent to search the house for firearms. During the search, officers located and seized five firearms in the trunk of a car in the attached garage, including the DPMS, model A-15, .223 caliber, semi-automatic rifle described in the single-count indictment against Barber. Barber, who has a prior conviction for second degree murder, was charged with Felon in Possession of a Firearm under 18 U.S.C. § 922(g)(1).

## II. LEGAL STANDARD

A court can dismiss a defective indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), and an indictment premised on a statute that is unconstitutional must be dismissed. *See United States v. Brown*, 715 F.Supp.2d 688, 689–90 (E.D. Va. 2010) (citing *In re Civil Rights Cases*, 109 U.S. 3, 8–9, 3 S.Ct. 18, 27 L.Ed. 835 (1883)) ("An indictment is defective if it alleges a violation of an unconstitutional statute.").

## III. DISCUSSION

Barber's dismissal motion turns entirely on his argument that Section 922(g)(1) is facially unconstitutional because it violates the Second Amendment. At the outset, the Court notes that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Thus, the

fact that Section 922(g)(1) "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid[.]" *Id.*

The Court further notes that, as relevant here, significant recent jurisprudence on the meaning and scope of the Second Amendment begins with the Fifth Circuit's 2001 decision in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001). In *Emerson*, the Fifth Circuit held that the Second Amendment "protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms. . . ." *Id.* at 260. However, *Emerson* recognized that the Second Amendment right was subject to "limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Id.* at 261. The *Emerson* court further concluded that such limitations included restrictions on the possession of firearms by felons. *Id.* (explaining that, "it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms").

In the years following *Emerson*, the Fifth Circuit rejected challenges to the constitutional validity of Section 922(g)(1) premised on the Second Amendment. *See United States v. Darrington*, 351 F.3d 632, 633–34 (5th Cir. 2003) (holding that Section 922(g)(1) "does not violate the Second Amendment"); *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) (upholding Section 922(g)(1) and stating that, "[i]t

is not inconsistent with the Second Amendment to limit the ability of convicted felons to keep and possess firearms.").

In 2008, the Supreme Court issued its decision in *District of Columbia v. Heller*, concluding that the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (striking down a D.C. ordinance banning handgun possession in the home). Two years later, the Supreme Court held, in *McDonald v. City of Chicago*, that the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right recognized in *Heller*, making it enforceable against the States. 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

In the wake of *Heller*, the Fifth Circuit considered and again rejected Second Amendment challenges to Section 922(g)(1), concluding that nothing in the Supreme Court's decision warranted reconsideration of the court's post-*Emerson* decisions rejecting similar Second Amendment challenges. As the court explained in *United States v. Scroggins*, "[p]rior to *Heller*, this circuit had already recognized an individual right to bear arms, and had determined that criminal prohibitions on felons (violent or non-violent) possessing firearms did not violate that right." 599 F.3d 433, 451 (5th Cir. 2010) (citations omitted). Pointing to dicta in *Heller* confirming that "the opinion should not 'be taken to cast doubt on long-standing prohibitions on possession of firearms by felons,'" *id.* (quoting *Heller*, 554 U.S. at 626) (alteration in original), the *Scroggins* court concluded that the defendant had presented "no Second Amendment argument that our cases have not already considered and rejected." *Id.*;

5

*see also United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) ("*Heller* provides no basis for reconsidering *Darrington*.").

In sum, both before and after *Heller* the Fifth Circuit consistently has rejected Second Amendment challenges like Barber's to the validity of Section 922(g)(1). In Barber's view, however, the Supreme Court's recent decision in *Bruen*, which clarified the framework for evaluating whether firearm regulations can withstand Second Amendment scrutiny, invalidates the Fifth Circuit's prior precedent and requires this Court to find that Section 922(g)(1) is unconstitutional. Barber is mistaken. As the Court will explain, applying *Bruen*'s test to dangerous felons like Barber, Section 922(g)(1) imposes constitutionally valid restrictions on the possession of firearms.

## A. *Bruen*'s framework for Second Amendment analysis

In *Heller*, the Supreme Court "did not set forth an analytical framework with which to evaluate firearms regulations in future cases." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives (NRA)*, 700 F.3d 185, 194 (5th Cir. 2012). The *Heller* court did, however, provide some guidance on the scope of the Amendment. Most relevant here, the Supreme Court stated that, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and identified such prohibitions as "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626–27 n.26.

Post-*Heller*, like its sister circuits, the Fifth Circuit "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). The first step of the inquiry addressed the question whether "the conduct at issue falls within the scope of the Second Amendment right."

*NRA*, 700 F.3d at 194. "To make that determination," the court would "look to whether the law harmonizes with the historical traditions associated with the Second Amendment." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (quoting *NRA*, 700 F.3d at 194). If the law burdened conduct that fell "outside the scope of the Second Amendment," the court would end the inquiry and uphold the law. *Id.*

When a challenged law burdened conduct protected by the Second Amendment, the court would proceed to step two of the inquiry, which required the court to determine and apply "'the appropriate level of means-ends scrutiny'—either strict or intermediate." *Id.* (quoting *NRA*, 700 F.3d at 195). As explained by the Fifth Circuit, "the appropriate level of scrutiny 'depend[ed] on the nature of the conduct being regulated and the degree to which the challenged law burden[ed] the [individual Second Amendment] right.'" *NRA*, 700 F.3d at 195 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)). When a regulation threatened "'a right at the core of the Second Amendment'—i.e., the right to possess a firearm for self-defense in the home," strict scrutiny would be applied, "while 'a regulation that [did] not encroach on the core of the Second Amendment'" would be evaluated under intermediate scrutiny. *McGinnis*, 956 F.3d at 754 (quoting *NRA*, 700 F.3d at 195).[2]

*Bruen* changed the landscape of Second Amendment analysis by rejecting the two-step inquiry adopted by the Fifth Circuit and other circuit courts, declaring the

---

[2] A regulation can survive strict scrutiny only if it is "narrowly drawn to provide the least restrictive means of furthering a compelling state interest." *Dart v. Brown*, 717 F.2d 1491, 1498 (5th Cir. 1983). Intermediate scrutiny may be satisfied by making the lesser showing of "a reasonable fit between the law and an important government objective." *NRA*, 700 F.3d at 205.

inquiry to be "one step too many." 142 S.Ct. at 2127. In his majority opinion, Justice Thomas concluded that the circuit courts' two-step inquiry, particularly at the second step, departed from the methodology employed by the Supreme Court in *Heller* to "defin[e] the character of the [Second Amendment] right (individual or militia dependent), suggest[] the outer limits of the right, or assess[] the constitutionality of a particular regulation." *Id*. at 2128–29. That methodology, Justice Thomas explained, "centered" and "relied" on "constitutional text and history," and "did not invoke any means-end test such as strict or intermediate scrutiny." *Id*.

The *Bruen* court went on to make clear that "the standard for applying the Second Amendment" is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id*. at 2129–30 (internal quotation marks and citation omitted). The *Bruen* framework thus contemplates that, when evaluating a Second Amendment challenge to a firearm regulation, courts will determine whether the Amendment "presumptively protects" the burdened conduct. That determination turns on whether the "plain text" of the Second Amendment "covers an individual's conduct." *Id*. If it does, then the regulation must be justified through a showing that it is consistent with America's historical tradition of firearm regulation.

8

## B. Application of *Bruen* to dangerous felons prohibited from firearm possession under Section 922(g)(1)

The Court will consider Barber's dismissal motion under the Second Amendment framework set forth in *Bruen*, rather than the Fifth Circuit's pre-*Bruen* two-step inquiry for Second Amendment analysis. The Supreme Court and other federal courts have recognized district courts' obligation to apply intervening Supreme Court precedent that conflicts with circuit authority. *See, e.g.*, *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("Even though applicable Sixth Circuit precedents were otherwise when this dispute arose, the District Court properly applied [supervening Supreme Court precedent] to this case."); *United States v. Egenberger*, 424 F.3d 803, 805 (8th Cir. 2005) ("The district court does not continue to be bound by prior interpretations of the law that are contrary to the Supreme Court's most recent announcement."); *Lee v. United States*, 570 F.Supp.2d 142, 149–50 (D.D.C. 2008) ("[W]hen holdings of the Supreme Court and the D.C. Circuit are irreconcilable, the Supreme Court's decision will trump every time."). Consistent with this obligation, the Court will follow *Bruen*'s recent guidance on applying the Second Amendment.

Barber's motion to dismiss turns on the premise that, under the *Bruen* framework, Section 922(g)(1) is unconstitutional on its face. The Court disagrees. Although Barber is correct that his conduct falls within the plain text of the Second Amendment, Section 922(g)(1), at a minimum, operates constitutionally under *Bruen* as applied to dangerous felons, like Barber himself, because the prohibition of dangerous persons from possessing firearms is "consistent with the Nation's

9

historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130. Thus, the premise of Barber's facial challenge, that "no set of circumstances exists" under which Section 922(g)(1) would be valid, *Salerno*, 481 U.S. at 745, is demonstrably wrong.

### i. The plain text of the Second Amendment covers Barber's conduct.

Applying *Bruen*, the Court first considers whether the Second Amendment's plain text covers Barber's conduct. The answer to this purely textual question is "yes," it does.

### a. The Second Amendment's text encompasses Barber's conduct.

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The burdened conduct at issue in this case is Barber's possession of a type of AR-15 semi-automatic rifle in his home. In *Heller*, the Supreme Court made clear that the Second Amendment's right to "keep and bear arms" includes possession of weapons, such as firearms, and "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. The Supreme Court further explained that the Amendment includes firearms that are "in common use," and "typically possessed by law-abiding citizens for lawful purposes." *Id*. at 624–25. *See also id*. at 627 (contrasting "dangerous and unusual weapons" that may be banned with protected "weapons . . . in common use at the time") (internal quotation marks and citations omitted).

The AR-15, which has been described as America's "most popular semi-automatic rifle," is covered under the Amendment's text. *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J.,

10

dissenting). In this regard, courts have repeatedly recognized that modern, semi-automatic rifles like the AR-15 are in common use by law-abiding citizens for self-defense. For example, the D.C. Circuit has observed that, "[a]pproximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." *Heller II*, 670 F.3d at 1261. The court went on to conclude that it was "clear enough" that semi-automatic rifles "are indeed in 'common use.'" *Id*.; *see also Colo. Outfitters Ass'n v. Hickenlooper*, 24 F.Supp.3d 1050, 1068 (D. Colo. 2014) (concluding that a statute "affect[ed] the use of firearms that are both widespread and commonly used for self-defense," in view of the fact that "lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions"), *vacated on other grounds*, 823 F.3d 537, 554 (10th Cir. 2016); *Shew v. Malloy*, 994 F.Supp.2d 234, 246 (D. Conn. 2014) (concluding that semi-automatic rifles such as the AR-15 as well as magazines with a capacity greater than 10 rounds "are 'in common use' within the meaning of *Heller* and, presumably, used for lawful purposes"), *reversed in part on other grounds sub nom. N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 269 (2d Cir. 2015).

Like the courts that have previously considered this question, this Court has little difficulty in concluding that Barber's semi-automatic rifle is a firearm in common use by law-abiding citizens and therefore is encompassed by the text of the Second Amendment. In sum, the plain text of the Second Amendment covers Barber's conduct, namely his possession of an AR-15 type semi-automatic rifle in his home.

### b. The Amendment's text is not limited to "virtuous" citizens.

The Government resists this conclusion, suggesting that Barber's motion fails under *Bruen*'s initial inquiry because, as a convicted felon, Barber is not a "law abiding citizen" and is therefore not a part of "the people" protected by the text of the Second Amendment. As then-Judge Barrett recognized in *Kanter v. Barr*, this type of Second Amendment argument implicates a "conceptual point" concerning "competing ways of approaching the constitutionality of gun dispossession laws." 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). One view of analyzing such laws under the Second Amendment is that "there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope." *Id.*[3] (citations omitted). Under this approach, the Second Amendment's plain text covers only "virtuous" citizens. *Binderup*, 836 F.3d at 348 (plurality op.) (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam)) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" (quotations omitted)).

As then-Judge Barrett has noted, a second approach to analyzing the Second Amendment adheres to the view that "all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). "These approaches will

---

[3] *See also Binderup v. Att'y Gen.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among 'the people' entitled to keep and bear arms.").

12

typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." *Id*. The Court agrees that "the latter is the better way to approach the problem." *Id*.

The "virtuous citizen" theory, which excludes certain groups of people—like convicted felons—from the plain text of the Second Amendment, misreads *Heller*. Justice Scalia's majority opinion carefully analyzed the term "right of the people" in the Second Amendment's operative clause. Of particular importance, Justice Scalia observed in *Heller* that the phrase "right of the people" appears two other times in the unamended Constitution and the Bill of Rights, in the First Amendment's Assembly-and-Petition Clause and in the Fourth Amendment's Search-and-Seizure Clause, and that "similar terminology" is used in the Ninth Amendment. *Heller*, 554 U.S. at 579 (quoting the Ninth Amendment's text stating that the enumeration of certain rights in the Constitution "shall not be construed to deny or disparage others retained by the people"). In addition to concluding that all three of these instances "unambiguously refer to individual rights," rather than "collective" rights, *id.*, the *Heller* court reaffirmed that the term "the people" was a "term of art employed in select parts of the Constitution," and its uses suggest that "the people" "protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community," *id.*

13

at 580–81 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)).

Having made clear that the scope of the term "the people" in the Second Amendment is coextensive with that term as used in the other referenced Amendments, the *Heller* court stated that there is a "strong presumption" that the Second Amendment right "is exercised individually and belongs to all Americans." *Id.* at 581.[4] As aptly explained by then-Judge Barrett in *Kanter*, "[n]either felons nor the mentally ill are categorically excluded from our national community," nor are they categorically excluded from a right that belongs to "all Americans." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (quotations omitted); *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 915–20 (3d Cir. 2020) (Bibas, J., dissenting) (rejecting the virtue theory and concluding that the historical record does not support the notion that "the Founders limited the Second Amendment right to virtuous citizens and excluded all felons"); *Binderup*, 836 F.3d at 372 (en banc) (Hardiman, J., concurring in part and concurring in the judgments) (same). There is no doubt that felons fall within the scope of the other Amendments identified in *Heller*, including the First Amendment's Assembly-and-Petition Clause and the Fourth Amendment's Search-and-Seizure

---

[4] The Court notes that Justice Scalia's opinion includes additional references to the scope of the Second Amendment right that further confirm it belongs to all Americans. For example, *Heller* cites and quotes the Georgia Supreme Court's decision in *Nunn v. State*, 1 Ga. 243 (1846), as an opinion that "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." *Heller*, 554 U.S. at 612. In support of this conclusion, *Heller* quotes a passage in *Nunn* stating that the Second Amendment secures a "right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*. . . ." *Id.* (quoting *Nunn*, 1 Ga. at 251).

Clause. Because the *Heller* court unequivocally equated the scope of the Second Amendment right with the rights secured by these other Amendments, rights belonging to all Americans, the Court rejects the Government's argument that all felons are categorically outside the scope of the Second Amendment's text because they are not "virtuous citizens."

### ii. Section 922(g)(1)'s prohibition on possession of firearms by dangerous felons like Barber, is consistent with America's historical tradition of firearm regulation.

The fact that the plain text of the Second Amendment covers Barber's conduct does not mean that his possession of a firearm cannot be prohibited consistent with the right secured by the Amendment. "Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Kanter*, 919 F.3d at 453. (Barrett, J., dissenting).

*Bruen* contemplates just such an inquiry. Because Section 922(g)(1) covers conduct protected by the Second Amendment, it must be justified through a showing that the statute is consistent with America's historical tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2129–30. The Court concludes that, at least as applied to dangerous felons like Barber, Section 992(g)(1) satisfies *Bruen*'s standard. For this reason, Barber's facial challenge to the statute fails, as would any as-applied challenge made by Barber.

### a. *Bruen*'s metrics for evaluating whether a historical regulation is "relevantly similar" to a modern firearm regulation

Justice Thomas's majority opinion in *Bruen* provides guidance on how courts should analyze whether a statute limiting firearm possession is "consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129–30. That guidance begins with the observation that the test set forth in *Bruen*, consistent with *Heller*, "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id*. at 2131. *Bruen* also recognized that, in evaluating the validity of present-day firearm regulations, the historical inquiry to be conducted by courts "will often involve reasoning by analogy." *Id*. at 2132. The Supreme Court explained that, "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id*. (citation omitted).

*Bruen* then provided "two metrics" to be applied by courts in evaluating whether a historical regulation is "relevantly similar" to a modern firearm regulation, and therefore can serve as a proper analogue for the present-day law: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132–33. These metrics are grounded in the Supreme Court's prior decisions in *Heller* and *McDonald*, which emphasized that "individual self-defense is 'the *central component*' of the Second Amendment right." *Id*. at 2133 (quoting *McDonald*, 561 U.S. at 767; *Heller*, 554 U.S. at 599).

Finally, the *Bruen* court made clear that such analogical reasoning requires only the identification of "a well-established and representative historical *analogue*, not a historical *twin*." *Id*. Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

**b. America's historical tradition of firearm regulation includes regulations forbidding dangerous persons from possessing firearms.**

In its current form, Section 922(g)(1) prohibits any person who has been convicted of a crime punishable by imprisonment for a term exceeding one year from possessing a firearm. Thus, the statute encompasses individuals convicted of crimes as disparate as tax evasion, *see* 26 U.S.C. § 7201, and bank robbery, *see* 18 U.S.C. § 2113. The earliest version of the statute, enacted as the Federal Firearms Act of 1938, covered only those persons convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary. *See* Federal Firearms Act, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938). Nearly twenty-five years later, in 1961, the law was expanded to encompass all individuals convicted of a felony. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87–342, § 2, 75 Stat. 757, 757 (1961). In 1986, the law was recodified under Section 922(g). *See* Firearms Owners' Protection Act, Pub. L. 99–308, § 110, 100 Stat. 449 (1986). Thus, Section 922(g)(1)'s prohibition on firearm possession as to dangerous felons, taking into account prior incarnations of the law, has been in place for about 85 years.

To the extent that Section 922(g)(1) applies to all felons, it has been described by some as "wildly overinclusive" for encompassing nonviolent offenders. Adam

Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 721 (2007). Nonetheless, in the wake of *Heller* and *McDonald*, but before *Bruen*, circuit courts across the country, including the Fifth Circuit, uniformly upheld the constitutionality of Section 922(g)(1). *See, e.g.*, *United States v. Bogle*, 717 F.3d 281, 282 n.1 (2d Cir. 2013) (per curiam) (collecting cases); *Folajtar*, 980 F.3d at 901 ("Since *Heller*, we [the Third Circuit], along with every court to consider the issue, have rejected challenges that § 922(g)(1) on its face violates the Second Amendment."); *see also supra* Part III (discussing the Fifth Circuit's post-*Heller* decisions in the *Anderson* and *Scroggins* cases upholding the statute). The Court notes, however, that following *Heller* and *McDonald*, some prominent jurists reached a different conclusion concerning the validity of blanket bans on the possession of firearms by felons, and opined that the historical record does not support regulations permanently depriving all felons of the right to possess arms simply because of their status as felons. *See, e.g.*, *Kanter*, 919 F.3d at 464 ("History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons.") (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 914–15 (same) (Bibas, J., dissenting).

The Court is aware of only one post-*Bruen* circuit court decision considering a Second Amendment challenge to Section 922(g)(1). *See Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, No. 21-2835, 56 F.4th 992 (3d Cir. 2023). In an opinion that has since been vacated when en banc review was granted, a Third Circuit panel rejected an as-applied challenge to Section 922(g)(1) that was premised on the argument that enforcing the statute's firearms prohibition

against a non-violent criminal (welfare fraud) violates the Second Amendment. *Range*, 53 F.4th at 284–85.

To resolve Barber's facial challenge to Section 922(g)(1), this Court need not examine whether the statute may be applied, consistent with the Second Amendment, to non-violent felons. Section 922(g)(1)'s application to dangerous felons, like Barber, easily meets the Second Amendment standard set forth in *Bruen*. That is because the historical record supports the proposition that Congress "may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *see also Folajtar*, 980 F.3d at 914–15 (explaining that the history of felon disarmament shows that "the limit on the Second Amendment right was pegged to dangerousness") (Bibas, J., dissenting); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 285 (2020) ("Violent and other dangerous persons have historically been banned from keeping arms in several contexts—specifically, persons guilty of committing violent crimes, persons expected to take up arms against the government, persons with violent tendencies, distrusted groups of people, and those of presently unsound mind.").

The Court will examine the historical record on arms prohibitions, with a particular focus on the colonial and Revolutionary War period, as well as the Founding era through the end of the 19th century. In conducting this analysis, the Court relies in significant part on the thorough examination of the historical record

19

on felon disarmament assembled by then-Judge Barrett in her *Kanter* dissent, 919 F.3d at 453–64, and by Judge Hardiman in his *Binderup* concurrence, 836 F.3d at 367–74.

*The English tradition and arms prohibitions in the colonial period.*

The disarmament of persons who were considered dangerous or a threat to public safety has strong roots in English tradition. England's 1662 Militia Act empowered officers of the Crown to disarm anyone they judged to be "dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662). And English common law "punish[ed] people who [went] armed to terrify the King's subjects" with imprisonment and forfeiture of their "armour." *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686).

English history also shows that "dangerous persons" to be disarmed were frequently those considered to be disloyal to the Crown or otherwise involved in or sympathetic to rebellions or insurrections. Greenlee, 20 WYO. L. REV. at 258. For example, in 1684 King Charles II ordered his agents to seize arms "from dangerous and disaffected persons," who were made up of those disloyal to the King's government and who might want to overthrow it. *Id.* at 259 (internal quotation marks and citation omitted). Disaffection and dangerousness were often associated with religious differences in this period. Thus, when Protestants controlled the English government, they disarmed Catholics, premised on the fear that Catholics would revolt or otherwise engage in violence. *See* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 18–19, 122 (1994); *see also* ADAM WINKLER, GUNFIGHT: THE BATTLE OVER THE

RIGHT TO BEAR ARMS IN AMERICA, 115 (2011) (explaining that Parliament disarmed Catholics because the Protestant majority found them "untrustworthy"). When Catholics controlled the government, they disarmed Protestants for the same reasons. *See* Greenlee, 20 WYO. L. REV. at 259 n.56 (noting that the Catholic King James II ordered general disarmaments of regions inhabited by his Protestant enemies) (internal quotation marks and citation omitted). In short, in the period preceding American independence, England had established a tradition of disarming dangerous persons, which included both violent persons and persons considered to be disaffected and threatening to the Crown.

Consistent with the English tradition, the American colonies had similar disarmament laws, although such laws were "adapted to the fears and threats of that time and place." *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting). The colonists were "particularly fearful of the disloyal, who were potentially violent and dangerous." *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting). The colonies of Virginia and Massachusetts disarmed Catholics "on the basis of allegiance, not on the basis of faith," "with the intent of preventing social upheavals" and "rebellion." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157 (2007); ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA 22–23 (2001), *both quoted in Kanter*, 919 F.3d at 457 (Barrett, J., dissenting), and *Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting).

21

*The Revolutionary War*

During the Revolutionary War several colonies disarmed loyalists, who were considered dangerous to the colonial governments fighting for independence from England. Massachusetts disarmed loyalists so they could not "join with the open and avowed enemies of America" to inflict "ruin and destruction . . . against these Colonies." 2 AMERICAN ARCHIVES 793 (4th Ser., Peter Force ed., 1839) (May 1775). Pennsylvania disarmed loyalists who refused to swear allegiance to the State or the United States, in order to "eliminate[] the opportunity for [them] to violently protest the actions of the [state] government." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506–07 (2004). Again, the touchstone for such disarmament regulations was dangerousness, in these instances the perceived danger of Americans who remained loyal to King George III during the Revolution.[5]

*The Founding Era*

Given the Supreme Court's admonition that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 142 S.Ct. at 2136, the ratifying conventions are particularly instructive in construing the right secured by the Second Amendment.

---

[5] The fear of loyalists displayed by the colonies was not illusory. During the war, "over one hundred different Loyalist regiments, battalions, independent companies or troops were formed to fight alongside the British Army against their rebellious countrymen." *A History of the King's American Regiment, Part 1*, THE ON-LINE INSTITUTE FOR ADVANCED LOYALIST STUDIES, http://www.royalprovincial.com/military/rhist/kar/kar1hist.htm.

Three proposals from Constitution ratifying conventions addressed who may be prohibited from possessing arms. New Hampshire's proposal, the only one approved by a majority, provided: "Congress shall never disarm any Citizen, unless such as are or have been in actual Rebellion." *See* 1 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed. 1891). This proposal disarmed only those individuals who were both dangerous and who openly rebelled against the government.

At the Massachusetts convention, Samuel Adams proposed an amendment to the Constitution guaranteeing that "the said Constitution be never construed . . . to prevent the people of the United States who are peaceable citizens, from keeping their own arms." *See* 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675, 681 (1971). Adams's proposal allowed for the disarmament of persons who were not "peaceable," a term understood at the time to mean non-violent.[6]

Finally, Pennsylvania's "Dissent of the Minority" proposed amendments that included the following: "That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and *no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals.*" 2 SCHWARTZ,

---

[6] Samuel Johnson's dictionary defined "peaceable" as "1. Free from war; free from tumult. 2. Quiet; undisturbed. 3. Not violent; not bloody. 4. Not quarrelsome; not turbulent." 2 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773). Thomas Sheridan defined "peaceable" as "Free from war, free from tumult; quiet, undisturbed; not quarrelsome, not turbulent." THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 438 (2d ed. 1789). Noah Webster defined "peaceable" as "Not violent, bloody or unnatural." *Peaceable*, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, http://webstersdictionary1828.com/Dictionary/peaceable.

*supra*, at 662, 665 (emphasis added). Pennsylvania's proposal broadly embraces disarmament of both criminals and those who pose a danger to the public.

These three proposals "are most helpful taken together as evidence of the scope of founding-era understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). Significantly, all three proposals share a common concern: "threatened violence and the risk of public injury," "the same concern that animated English and early American restrictions on arms possession." *Id.*

*19th-century arms prohibitions*

As *Bruen* cautioned, "when it comes to interpreting the Constitution, not all history is created equal," 142 S.Ct. at 2136, and the Supreme Court has made clear that evidence from the 19th century should be treated as "mere confirmation" of what has already been established concerning the nature and scope of the right guaranteed by the Amendment, *id.* at 2137. The historical record of 19th-century arms prohibitions does not alter the Second Amendment analysis here. Most prohibitions on arms possession during this period were discriminatory bans on slaves and freedmen. *See* Greenlee, 20 Wyo. L. Rev. at 269. But such discriminatory bans were based on a perception of danger, albeit grounded in malevolent prejudice, and were particularly driven by "White fears that armed Blacks, especially freemen, might conspire to carry out a slave revolt." Nicholas Johnson et al., Firearms Law and the Second Amendment 440 (3d ed. 2021).

24

Another group targeted by firearms prohibitions in the latter part of the 19th century were so-called "tramps," "typically defined as males begging for charity outside of their home county." Greenlee, 20 WYO. L. REV. at 270. Because these prohibitions did not apply inside the home—or even the county—of the targeted persons, they were less restrictive than Section 922(g)(1), which applies everywhere. An 1878 New Hampshire law, for example, imprisoned any tramp who "shall enter any dwelling-house . . . without the consent of the owner . . . or shall be found carrying any fire-arm or other dangerous weapon, or shall threaten to do any injury to any person, or to the real or personal estate of another." 1878 N.H. Laws 612, ch. 270 § 2. Other States enacted similar laws during this period, including Vermont, Rhode Island, Ohio, Massachusetts, and Iowa.[7] The self-evident purpose of and justification for such laws was to protect the public from persons viewed to be dangerous, in keeping with prior arms restrictions from the colonial period and the Founding era.

*   *   *   *

Having reviewed the historical record, the Court concludes that Section 922(g)(1), at least as applied to those convicted of violent felonies or felonies that otherwise render them a physical threat to the public, is "relevantly similar" to historical regulations limiting the possession of arms by dangerous persons, and therefore meets the standard for constitutional validity set forth in *Bruen*. Grounded

---

[7] *See* 1878 Vt. Acts 30, ch. 14 § 3; 1879 R.I. Laws 110, ch. 806 § 3; 1880 Oh. Rev. St. 1654, ch. 8 § 6995; Mass. Gen. Laws 232, ch. 257 § 4 (1880); 1897 Iowa Laws 1981, ch. 5 § 5135.

in English tradition, and as evident through American history during the colonial period and Revolutionary War, the Founding era, and thereafter in the 19th century, prohibitions on the possession of arms by persons judged to be dangerous were commonplace. *See Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) (explaining that, "[i]n 1791—and for well more than a century afterward—legislatures disqualified categories of people from the right to bear arms" when they determined that doing so "was necessary to protect the public safety"). While the disarmament regulations during these timeframes are not "historical twins," for Section 922(g)(1), they are meaningful historical analogues for Section 922(g)(1)'s application to persons, like Barber, convicted of felonies that render them dangerous persons.

Indeed, Barber's motion highlights precisely why the disarmament of violent felons under Section 922(g)(1) is entirely consistent with the Second Amendment—allowing them to possess firearms endangers the community. Barber, a felon previously convicted of second degree murder, is prohibited from possessing a firearm under the statute. Ignoring that prohibition, Barber took possession of an AR-15 type semi-automatic rifle, and that weapon was then involved in a shooting that injured two people, one of whom was a child. Under the circumstances, Barber's claim that Section 922(g)(1) is facially invalid under the Second Amendment, and violates Barber's constitutional rights, is meritless.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Indictment Under the Second Amendment, (Dkt. #97), is **DENIED**.

**So ORDERED and SIGNED this 27th day of January, 2023.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE